## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JACKIE WILSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) No.  17 C 2561 |
| | ) |
| WEXFORD HEALTH SOURCES, INC.,[1] | ) Judge Rebecca R. Pallmeyer |
| GHALIAH OBAISI, independent | ) |
| executor of the estate of SALEH OBAISI, | ) |
| GERALD DIMAILIG, and | ) |
| JERRI M. ANGELOFF, | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM OPINION AND ORDER

Plaintiff Jackie Wilson went on a hunger strike that lasted over three years while he was incarcerated in Illinois state prison.  He has since filed suit under 42 U.S.C. § 1983 against the state's medical contractor, Wexford Health Sources, Inc. ("Wexford"), as well as various prison officials and health care employees, for treatment he experienced during the hunger strike. Plaintiff contends that Defendants were deliberately indifferent to his medical needs in violation of the Eighth Amendment's ban on cruel and unusual punishment, among other constitutional claims.

Defendants Wexford, Dr. Saleh Obaisi (since deceased and now represented in this lawsuit by the executor of his estate), and nurses Gerald Dimailig and Jerri Angeloff have moved for summary judgment on all of Plaintiff's claims.  Plaintiff himself seeks partial summary judgment as against Dr. Obaisi.  For the reasons stated below, the court denies both parties' motions for summary judgment on Plaintiff's Eighth Amendment claim against Defendant Obaisi, but grants Defendants' motion as to claims against all other Defendants.

---

[1]        Prior filings on this docket incorrectly list this Defendant's name as "Wexford Medical Services."

## BACKGROUND

### I.    Factual Background

The following facts are taken from the parties' Local Rule 56.1 statements and their supporting exhibits.[2]  Plaintiff was incarcerated for murder from 1982 to 2018; he has since been released, his conviction has been overturned, and he has received a Certificate of Innocence from an Illinois state court.  (DSOF Ex. 3 ("Wilson Dep.") 19:20–20:5; *see* Order Granting Pet. for Cert. of Innocence, *People v. Wilson*, No. 88 CR 07771-01 (Ill. Cir. Ct. Cook Cnty. Dec. 18, 2020).)  During Plaintiff's 36-year incarceration, he was confined in a number of Illinois Department of Corrections ("IDOC") facilities, but during most of the dates relevant to this case, he was held at Stateville Correctional Center ("Stateville") outside Joliet, Illinois.  (DSOF ¶¶ 8–11.)

Defendant Wexford is a private contractor that provides medical services to IDOC inmates at Stateville and other facilities.  (DSOF ¶ 2.)  During the relevant time period, Wexford employed Dr. Saleh Obaisi as its Medical Director at Stateville, and employed Dimailig and Angeloff as nurses.  (*Id.* ¶¶ 3–6.)  Dr. Obaisi passed away in December 2017 and was replaced in this lawsuit by Ghaliah Obaisi, the independent executor of his estate.  (*Id.* ¶ 3; Suggestion of Death [50].)

While incarcerated, Plaintiff engaged in several extended hunger strikes prior to the one at issue in this case, including one that had lasted for more than 600 days as of January 2012.  (DSOF ¶ 12; PSOAF Ex. 9 at 1.)  During that strike, he was force-fed a liquid diet via a nasogastric ("NG") tube, which is inserted through the nose and down the esophagus into the stomach.  (PSOAF Ex. 9 at 1; PSOAF Ex. 11 at 2.)  Plaintiff's medical records are inconsistent as to how much he weighed during this earlier hunger strike: while a January 2012 memo stated that he had "remained between 170-180 pounds" for the "entire 18 month period" in which he had been tube-

---

[2]        (*See* Defs.' Local Rule 56.1 Statement of Undisputed Material Facts [236] ("DSOF"); Pl.'s Statement of Undisputed Facts [238] ("PSOF"); Def. Obaisi's Resp. to PSOF [247]; Pl.'s Statement of Additional Facts [249] ("PSOAF"); Pl.'s Resp. to DSOF [250]; Defs.' Resp. to PSOAF [257].)

fed, records from December 2011 document his weight at just 124 pounds, and other records show he weighed 139 pounds in April 2012 and 123 pounds in October 2012. (PSOAF Ex. 9 at 2; Def.'s Resp. to PSOAF Exs. 3–5.)

Plaintiff initiated the hunger strike at issue in this lawsuit on January 1, 2014. (DSOF ¶ 8; PSOF Ex. 3.) He did so in response to an incident in which IDOC officials either lost or confiscated his personal property (the record is unclear as to which) while he was being transferred from Menard Correctional Facility to Stateville. (Wilson Dep. 81:16–82:17.) This property included both legal documents related to Plaintiff's criminal case and electronic equipment that he was permitted to maintain as the result of a settlement of an earlier lawsuit. (Wilson Dep. 37:21–39:3, 80:13–16.)

IDOC maintains a written policy "defining the responsibilities of staff in the event of an offender hunger strike." (PSOAF Ex. 15 at 1.) This policy sets out a series of required reporting steps and interventions that IDOC staff must follow, including regular medical monitoring to assess the prisoner's physical and mental condition beginning 72 hours after the strike commences. (*Id.* at 2–3.) If a hunger strike progresses to the point where a physician certifies that an inmate's health is at serious risk, prison officials may order that the prisoner be involuntarily fed. (*Id.* at 5.) Wexford medical staff adhere to IDOC's hunger strike policy when they are employed in IDOC facilities. (DSOF ¶ 39.) Pursuant to this policy, Plaintiff was placed in a cell in Stateville's Health Care Unit after he declared his hunger strike so that he could be regularly monitored by Wexford medical staff. (DSOF ¶¶ 13–14.)

In late January 2014, Dr. Obaisi made the decision to start force-feeding Plaintiff. (Pl.'s Resp. to DSOF ¶ 17.) To conduct these feedings, Wexford staff inserted an NG tube and fed him a liquid diet. (*Id.*) Once inserted, the NG tube was initially left inside Plaintiff for more than a month; after a March 17, 2014 X-ray revealed that the tube was "kinked back" at the junction between Plaintiff's esophagus and stomach, Dr. Obaisi ordered that it be "repositioned." (PSOAF ¶ 11, Ex. 14 at 1.) Plaintiff's diet initially consisted of vegetarian liquid (at his request) and juice;

3

after a few months, Dr. Obaisi also added in cartons of "Boost," a nutritional supplement requisitioned through forms submitted to Wexford's corporate office.[3]  (DSOF ¶ 19, Ex. 13 at 4–9.)  During at least some of these feedings, Plaintiff was restrained by the prison's tactical team.[4] (PSOAF ¶ 8.)

According to an IDOC medical chart recording Plaintiff's basic vital signs over time, Plaintiff weighed 172 pounds on February 7, 2014, one month after the beginning of his hunger strike.  (DSOF Ex. 6 at 1.)  His weight hovered around 150 to 160 pounds over the following months, and was measured at 161 pounds on May 31, 2014.  (*Id.* at 10.)  The record is then silent on his weight through March 2015—possibly because, as reflected in documentation, Plaintiff was regularly refusing nurses' attempts to assess him and measure his vital signs.  (*See, e.g.*, DSOF Ex. 4 at 119, 171, 219; DSOF Ex. 5 at 28.)

On August 7, 2014, Plaintiff filed a grievance with IDOC alleging that Wexford's nursing staff had "refuse[d] to force feed [him] in accordance with [IDOC's] Administrative Directive" on hunger strikes.  (PSOAF Ex. 4 at 1.)  Plaintiff acknowledged in this grievance that he had "refuse[d] to cooperate with the hunger strike feeding procedures" on August 1 (precisely how or why is not made clear); he asserted that the nurses had since stopped tube-feeding him and were refusing to enter his cell without the prison's tactical team present, but also refusing to request

---

[3]     Plaintiff disputes that Dr. Obaisi complied with his requested diet and alleges staff did not disclose that they were in fact feeding him eggs.  (Pl.'s Resp. to DSOF ¶ 19.)  As an initial matter, Plaintiff informed Dr. Obaisi at the time that he was vegetarian, not vegan.  (Wilson Dep. 104:17–105:19.)  Setting aside whether eggs are acceptable in a vegetarian diet, Obaisi's therapeutic diet order records suggest this happened only once, on July 6, 2015, and was almost immediately corrected with a revised order the next day stating that Plaintiff should *not* be fed eggs.  (DSOF Ex. 13 at 18–19.)

[4]     Plaintiff alleged that he was restrained "[e]very time" he was force-fed, but this is not clearly consistent with other evidence in the record.  (Wilson Dep. 58:19–20.)  Medical records from 2016 suggest that he began inserting and removing the NG tubes himself as his hunger strike progressed, rather than allowing nursing staff to do so, which would seem difficult if not impossible to accomplish while handcuffed.  (*See, e.g.*, DSOF Ex. 5 at 53, 63, 101.)

this tactical-team assistance from prison administrators.[5]  (*Id.*)  Plaintiff claimed that he "blacked out" in his cell on August 4 "as a result of not being force fed for a total of four days" and injured his head and back.  (*Id.* at 2.)  He wrote that, when Dr. Obaisi visited him in his cell on August 7, Plaintiff asked whether he was to be force-fed and Dr. Obais responded that he was.  (*Id.*)  But when Plaintiff complained that he had not in fact been fed for more than six days, Dr. Obaisi allegedly "refused to answer," and a nurse present in the cell "cut in" and stated: "[I]f I needed extra security to force feed grievant, then that meant grievant refused force feeding."  (*Id.*)  Thirteen days later, Plaintiff filed a follow-up grievance alleging that the nursing staff were continuing to deny him tube-feedings on the grounds that "they fear for their life and refuse to enter [his] cell" without the tactical team present.  (*Id.* at 3, 5.)  He alleged that he was "now down to 135 pounds," though there is no formal measurement of his weight from this time in the record before the court.  (*Id.* at 6.)

Plaintiff's contemporaneous medical records from August 4 through 25 of 2014 include a series of "Refusal of Medical Services" forms. These forms, one for almost every day in this period, contain notes stating that Plaintiff "refused" his liquid NG tube feedings when offered them, and are marked "refused to sign" under the field for Plaintiff's signature.  (*See* DSOF Ex. 8 at 114–57.)  The record also contains a medical examination form indicating that Plaintiff had fallen and hit his head on August 4, but had sustained "[n]o apparent injuries."  (PSOAF Ex. 14 at 3.)

While the record does not reveal how this episode was resolved, Plaintiff eventually resumed being tube-fed and continued his hunger strike through the end of 2014 and into 2015.

---

[5]     Plaintiff's complaint alleged that "[p]ursuant to IDOC policy, when a person is involuntarily force fed, the tactical team is supposed to be present at all times and the feeding is to be recorded," so that "the institution and the medical providers can be sure that [the] inmate's 8th Amendment rights are being met."  (Third Am. Compl. ¶ 12.)  When questioned on this point in his deposition, Plaintiff attributed this rule to "[a]dministrative directives" he had received "[t]hrough other prisoners."  (Wilson Dep. 44:13–45:8.)  No such documents, however, are present in the record before the court; the only available IDOC Administrative Directive concerning hunger strikes says nothing about the tactical team at all, much less whether and under what circumstances the nurses were required to request their presence.  (*See* PSOAF Ex. 15.)

(*See* DSOF Ex. 8 at 158–222; DSOF Ex. 9 at 1–66.)  As the strike progressed, Plaintiff became increasingly dissatisfied with the manner in which Wexford's nurses were tube-feeding him.  He accused them of roughly inserting the NG feeding tubes down his nose and throat in a way that caused him pain and discomfort, as well as reusing old NG tubes that had previously been used to feed him.  (PSOAF ¶ 13; Wilson Dep. 56:17–20.)  The nurses' medical station was directly across from where Plaintiff was held in the health care unit during his hunger strike, and Plaintiff later testified that he could see the used tubes being stored there after they had been extracted from him.  (Wilson Dep. 65:24–66:19.)

On March 19, 2015, Wexford's corporate office denied a nutritional supplement request that Dr. Obaisi had submitted for six months of Boost cartons to be used in Plaintiff's tube-feedings.  (DSOF Ex. 13 at 1.)  The denial, signed by Paul Saporito—a registered nurse listed as a "reviewing practitioner" on the requisition form—stated that "[b]ased on the information" that Dr. Obaisi had provided regarding Plaintiff's situation and vital signs, the "inmate does not qualify for supplementation."  (*Id.*)  While there was an option on the form to appeal Saporito's decision to Wexford's "Corporate Medical Director," Obaisi presumably declined to do so as this field is left blank.  Plaintiff's weight was listed at 153 pounds on a copy of this form dated the following day.  (*Id.* at 2.)

Two months later, on May 20, 2015, Plaintiff filed another grievance.  (PSOAF Ex. 5 at 1.)  He asserted that Dr. Obaisi had directed that his feeding tube be removed on March 25 following a routine physical exam, and that when he asked the nurse on duty "how was they going to feed him now," she responded that "[the] doctor said [he] could eat regular food" and that she "didn't know when [D]octor Obaisi would force feed grievant again."  (*Id.* at 2.)  When Plaintiff met with Dr. Obaisi five days later on March 30, Obaisi allegedly affirmed that "he wasn't going to continue to force feed him" at all because Wexford had denied the Boost order—even though Plaintiff could presumably have been fed other nutrients such as vegetable broth.  (*Id.*)  Plaintiff alleged in his May 20 grievance that he had not been tube-fed anything for 49 days, was suffering from

"stomach cramps, head pains, and weakness" as well as "hunger, chronic stress, bed sores, depression, anxiety and trauma," and had passed out in his cell. (*Id.*)  His grievance ends with the following lines:

> #11) On May 12, 2015 at or about 10:35 am doctor "Obaisi" came to examine grievant again and became upset when grievant question him about feeding him, doctor "Obaisi" told grievant that if he wanted to eat he can eat regular food.
>
> #13) Grievant pointed out that he was on a hunger strike and wouldn't eat any food by mouth, grievant Obaisi then told grievant that he will just die then.
>
> #14) Grievant then ask doctor "Obaisi" to get out of his cell, doctor "Obaisi" then went on to say that it was grievant choice to eat or die.

(*Id.* at 3 (quotation marks in original).)

Plaintiff's medical records from March through June of 2015 contain another series of "Refusal of Medical Treatment" forms signed by various members of Wexford's nursing staff, including Nurses Dimailig and Angeloff.  (DSOF Ex. 9 at 68–216.)  These forms—again one for nearly every day of the period in question, each marked as "refused to sign" under Plaintiff's name—note that Plaintiff had refused breakfast, lunch, and dinner "state food tray[s]" (*id.* at 117) when "offered to him for oral ingestion" (*id.* at 206).  Plaintiff's medical charts list his weight at 135 pounds on April 15, 2015, 21 days after Dr. Obaisi's alleged order to cease tube feeding.  (DSOF Ex. 6 at 11.)  One month later, on May 16, 2015, Plaintiff weighed in at only 118 pounds and was placed on an IV for two days.  (*Id.*; PSOAF Ex. 6.)  On June 4, 2015, Dr. Obaisi submitted another nutritional supplement request for Boost, which reported Plaintiff's weight at 126 pounds and listed "[s]evere weight loss from hunger strike" as the medical condition being treated.  (DSOF Ex. 13 at 3.)  This time, Mr. Saporito approved the request.  (*Id.*)

After Plaintiff's tube-feedings resumed, he regained weight over the next few months and was listed at 162 pounds by the beginning of September 2015.  (DSOF Ex. 6 at 12–21; PSOAF ¶ 19.)  In October 2015, Dr. Obaisi sent Plaintiff to see an external otolaryngologist ("ENT") after he complained of a chronically sore and scratchy throat.  (DSOF ¶ 28.)  The ENT, Dr. Ari Rubenfeld, noted that Plaintiff's "sore throat was likely due to repeated [NG] tube" placement, and

recommended "no intervention unless patient eats or agrees to [a gastrointestinal] tube."  (*Id.*)  During this period, Plaintiff also developed back pain starting around May 2015.  (PSOAF ¶ 21.)  He was initially prescribed Tylenol, but after his pain worsened, Dr. Obaisi also prescribed Tramadol[6] in January 2016.  (*Id.* ¶ 23.)  On January 18, 2016, Plaintiff was sent to an outside hospital with abdominal pain and vomiting to be screened for peptic ulcer disease.  (*Id.* ¶¶ 24–25.)  He underwent a CAT scan that revealed no signs of an ulcer, but showed that he had a non-cancerous enlarged prostate pressing against his bladder; Dr. Obaisi subsequently prescribed antibiotics and prostate medication for him.  (DSOF ¶¶ 25–27.)

In late August and early September 2016, Plaintiff submitted another series of grievances alleging that Dr. Obaisi had again suspended his tube-feedings.  (PSOAF ¶ 27, Ex. 2 at 3.)  These grievances are not in the record, so their precise content is unclear.  According to an April 2017 email from a Stateville official[7] in response to an inquiry from IDOC's central grievance review office, Dr. Obaisi had "wr[itten] an order" to the nurses on August 16, 2016 "that if inmate refused feeding, it was o.k., they did not need to call the TACT team or the doctor."  (*Id.* at 2.)  The email further stated that since "[m]edical intervention is determined by the doctor" under the IDOC's hunger-strike policy, "the doctor's order did not have to force the feeding if he refused."  (*Id.*)  IDOC's June 2017 official denial of Plaintiff's grievance essentially reiterated this conclusion, stating that "[p]er medical doctor's order . . . offender was allowed to refuse feeding so did not have to force feed."  (*Id.* at 3.)

---

[6]     The court understands that Tramadol is an opioid analgesic.  *See Tramadol (Oral Route)*, Mayo Clinic (Mar. 1, 2024), https://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050.

[7]     The message is from an individual named "Tamera D. Turner" in response to a March 28, 2017 message from Melissa Phoenix of the IDOC's Office of Inmate Issues to a "Gail Wells," which Wells then forwarded to Turner on April 3, 2017; Wells then forwarded Turner's April 4 response back to Phoenix.  (PSOAF Ex. 2 at 2.)  Neither Walls's nor Turner's titles are made clear from the record.

Plaintiff's time under Dr. Obaisi's care ended in the "winter of 2016" when he was transferred from Stateville back to Menard. (DSOF ¶ 11.) He finally declared his intention to terminate his hunger strike a few months later in February 2017, at the advice of one of his attorneys in a separate case. (DSOF ¶ 10; Wilson Dep. 50:7–51:13.) It appears that Plaintiff transitioned off his hunger strike slowly: he was listed as "currently eating and also taking Ensure shakes" when he was transferred again to Cook County Jail in July 2017, but two months later, he told a medical provider at the jail that he remained on strike. (DSOF Ex. 15 at 1, 3.) By this time, Plaintiff seems to have regained substantial weight: the provider noted her opinion in the progress note from the visit that Plaintiff was clearly "NOT on a hunger strike" and was "almost overweight and eating daily" at a body mass index ("BMI") of 24. (*Id.* at 3.)

## II.    Procedural History

Plaintiff filed this lawsuit pro se in April 2017 while still a prisoner at Menard. (Compl. [1].) This court initially dismissed his case on procedural grounds due to Plaintiff's failure to disclose his full litigation history, and alternatively for failing to state a claim for relief. Specifically, the court found that binding Seventh Circuit precedent prevented Plaintiff from "engineer[ing] an Eighth Amendment violation" by "voluntarily going on a hunger strike and then blam[ing] the prison for resulting medical issues." (Order [13] at 3 (citing *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005).) Plaintiff appealed [20] and, in February 2019, the Seventh Circuit reversed this court's dismissal and remanded with instructions to allow Plaintiff leave to amend. *Wilson v. Wexford Med. Servs.*, 751 F. App'x 956 (7th Cir. 2019). The Seventh Circuit held that Plaintiff's failure to disclose his litigation history did not support a with-prejudice dismissal, but agreed with the court's alternative conclusion that "to the extent Wilson's alleged medical conditions resulted from his hunger strike . . . those allegations amounted to an attempt to 'engineer' an Eighth Amendment violation," and warned Plaintiff to amend his complaint with this in mind. *Id.* at 958.

On remand, Plaintiff—since released from prison—obtained counsel [38] and filed a new complaint [39] that named Wexford and 21 individuals employed by either Wexford or IDOC as

defendants.[8]  After these Defendants filed a series of motions to dismiss [66, 75, 92, 95, 99] and Plaintiff amended his complaint in response [89], the court denied these motions in part in February 2020 [105] and the case proceeded to discovery and settlement efforts.  In November 2020, Plaintiff again amended his complaint [154] to narrow the list of defendants to Dr. Obaisi, seven members of Stateville's nursing staff (four represented by the Illinois Attorney General's Office and three by Wexford's counsel), Stateville's warden, and Wexford.

After preliminary settlement discussions overseen by Magistrate Judge Sunil R. Harjani, the parties attended a mediation on August 16, 2022 at which Plaintiff reached a binding settlement agreement with the Defendants represented by the Attorney General [219].  Plaintiff was not, however, able to reach settlement with the Defendants represented by Wexford's counsel, who subsequently moved for summary judgment against Plaintiff's claims on March 5, 2023 [235].  That motion, and Plaintiff's cross-motion against Dr. Obaisi [237], are now before the court for decision.

## **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  If the moving party meets their initial burden of showing that no such dispute exists, the nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  In evaluating summary judgment motions, courts must consider all evidence in the record and must "draw all reasonable inferences from that evidence in favor of the party opposing summary judgment."  *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (citation

---

[8]       Specifically, Plaintiff's amended complaint named Dr. Obaisi and seventeen members of Stateville's nursing staff, along with Stateville's warden, two other IDOC administrators, and Wexford.  (First Am. Compl. [39] ¶¶ 4–7; Second Am. Compl. [89] ¶¶ 4–7.)

omitted).  The court may not weigh conflicting evidence or make credibility determinations in doing so.  *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).  In granting or denying summary judgment, the court "may consider any evidence that would be admissible at trial" in form or in content.  *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016); *see* FED. R. CIV. P. 56(c)(2).

## DISCUSSION

In his most recent complaint, Plaintiff alleges (1) denial of medical care in violation of the Eighth Amendment, (2) First Amendment retaliation, and (3) conspiracy to deprive him of his constitutional rights.  (Third Am. Compl. ¶¶ 33–61.)  Defendants have moved for summary judgment on all three counts.  In his response, Plaintiff abandoned both of the latter counts and focused entirely on his Eighth Amendment claim.[9]  (*See generally* Pl.'s Resp. in Opp. to Defs.' Mot. for Summ. J. [251].)  "Failure to respond to an argument [at summary judgment] . . . results in waiver."  *Hernandez v. Rhee*, No. 18 C 7647, 2021 WL 3408510, at *8 (N.D. Ill. Aug. 4, 2021) (quoting *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010)).  The court thus dismisses Plaintiff's second and third counts as waived against all Defendants, and considers only Plaintiff's Eighth Amendment claim on the merits.

## I.    The Eighth Amendment's Deliberate Indifference Test

The Eighth Amendment's prohibition of cruel and unusual punishment extends to "deliberate indifference to serious medical needs of prisoners."  *Brown v. LaVoie*, 90 F.4th 1206, 1212 (7th Cir. 2024) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  Courts evaluating

---

[9]    Plaintiff also sought punitive damages against all Defendants in his complaint. (*See* Third Am. Compl. at 11.)  Defendants argued in their summary judgment briefing that this claim for punitive damages should be dismissed—both because Plaintiff has failed to prove that any Defendant acted with the requisite "evil motive or intent" or "reckless or callous indifference," and because other courts in this district have already held that since Dr. Obaisi is deceased, imposing punitive damages on his estate does not further the deterrence goals these penalties are meant to serve.  *See Flournoy v. Est. of Obaisi*, No. 17 C 7994, 2020 WL 5593284, at *14 (N.D. Ill. Sept. 8, 2020).  Because Plaintiff failed to respond to this argument as well, the court grants Defendants' motion as to his claim for punitive damages.

Eighth Amendment claims related to medical care apply a two-step test: (1) the prisoner must have an objectively serious medical condition, and (2) the defendant must be subjectively aware of and consciously disregard that condition. *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The objective element of this test requires a medical condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The subjective element "mirrors the recklessness standard of the criminal law" in that the defendant must have actually known of and ignored a substantial risk to the plaintiff's health; mere negligence or even malpractice is not sufficient. *Brown*, 90 F.4th at 1212. The plaintiff must prove "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the[ir] decision on such judgment." *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 679 (7th Cir. 2023) (citation omitted). This can take the form of either inappropriate care or an "unjustifiable delay" in providing care that "exacerbated the inmate's injury or unnecessarily prolonged his pain." *Id.* (citation omitted).

The Supreme Court has separately recognized that depriving prisoners of life's basic necessities, such as "adequate food," may constitute cruel and unusual punishment. *Farmer*, 51 U.S. at 832; *see also Wilson v. Seiter*, 501 U.S. 294, 304 (1991). Whether "denying a prisoner adequate nutrition" violates the Eighth Amendment depends on "the amount and duration of the deprivation." *Owens v. Lamb*, No. 21-1148, 2023 WL 3674666 (7th Cir. May 26, 2023) (citing *Reed v. McBride*, 178 F.3d 849, 853 (7th Cir. 1999)). To satisfy the objective element of the deliberate-indifference test, the food served (if any) must be so "nutritionally inadequate" as to be dangerous, not merely unappetizing. *Williams v. Shah*, 927 F.3d 476, 481 n.3 (7th Cir. 2019).

The Seventh Circuit has applied these general standards to situations involving prisoners' self-deprivation of food in a trio of cases: *Rodriguez v. Briley*, 403 F.3d 952 (7th Cir. 2005), *Freeman v. Berge*, 441 F.3d 543 (7th Cir. 2006), and *Owens v. Hinsley*, 635 F.3d 950 (7th Cir.

2011).  First, in *Rodriguez*, a prisoner brought an Eighth Amendment challenge for being denied meals after he repeatedly failed to comply with a prison rule requiring inmates to store their belongings in a storage box in their cell before visiting the cafeteria.  403 F.3d at 952.  The prisoner initially weighed "between 250 and 300 pounds" at 5'8" tall, but lost 90 pounds over the course of 18 months from missing meals.  *Id.*  Affirming a grant of summary judgment for the defendants, the Seventh Circuit observed that "deliberate noncompliance with a valid rule does not convert the consequences that flow automatically from that noncompliance into punishment."  *Id.* at 952–53.  The court acknowledged in dicta that "the prison would have to intervene" if the prisoner's refusal "turn[ed] suicidal" or if their "noncompliance with the rule were a product of insanity," but found "[n]either [situation] . . . present here."  *Id.* at 953.

Similarly, in *Freeman*, a prisoner in a Wisconsin "supermax" facility sued under the Eighth Amendment for being denied food when he refused to comply with several of the prison's mealtime rules, including wearing pants when having meals delivered to his cell.  441 F.3d at 544.  The Seventh Circuit rejected this claim as well: the prison's requirements were a "reasonable condition of being fed," and the record did not indicate that the prisoner's "life or health was jeopardized" by their enforcement.  *Id.* at 545, 547.  The prisoner initially weighed 195 pounds at 5'6", but lost 45 pounds over 31 months, placing him "closer to the normal weight for a person of his height than when he began."  *Id.* at 547.  While there was some evidence that the prison's policy of conducting regular medical checks on inmates who skipped meals had not been strictly complied with—"[t]wice Freeman did not receive a timely inspection and as a result, on each occasion, went eight days straight without a meal"—he suffered no lasting consequences other than "unpleasant symptoms, such as blurred vision."  *Id.*

Finally, in *Owens*, a prisoner went on two successive hunger strikes, one lasting 25 days and the next for roughly six weeks; he ended the second strike the day after administrators

obtained a court order allowing them to force-feed him.[10]  635 F.3d at 952–53.  Citing *Rodriguez*

and *Freeman,* the Seventh Circuit again affirmed summary judgment for the prison officials.  *Id.*

at 955.  Owens, who was "5' 4" and average[d] 195 pounds" beforehand—placing his BMI in the

"obese" range—lost 20 pounds during the initial strike but "regained all of that weight"; he lost

over 30 pounds in the second strike, but there was "no evidence of medical complications" other

than his complaints of "bec[oming] weak" from lack of food.  *Id.* at 953, 955; *see* Nat'l Heart, Lung,

& Blood Inst., *Calculate Your Body Mass Index*, Nat'l Inst. of Health,

https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited Mar. 22, 2024)

(listing BMI ranges).

This court interprets *Rodriguez*, *Freeman*, and *Owens* as sketching out the following

guidelines.  At base, a prisoner cannot "engineer" Eighth Amendment claims "by going on a

hunger strike and blaming the prison for his resulting loss of weight."  *Rodriguez*, 403 F.3d at 953.

Nor does a prison official violate the Eighth Amendment by denying food to an inmate who refuses

to adhere to reasonable regulations.  *Id.* at 952–53; *Freeman*, 441 F.3d at 545.  As an exception

to this principle, however, "a prison can[not] allow a prisoner to [either] starve himself to death, or

even starve himself to the point at which he seriously impairs his health . . . ."  *Freeman*, 441 F.3d

at 546.  Where the prisoner is either insane, sane but suicidal, or "prepared to risk death from a

hunger strike to make a political point," the prison has "a duty and certainly a right to step in and

force [them] to take nourishment."  *Id.* at 547.  This follows from prison suicide cases that have

recognized potential deliberate indifference claims from prison officials' failure to intervene in an

inmate's death.  *See, e.g.*, *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001) ("It goes

---

[10]     While the IDOC hunger strike policy provided in the record (listed as having been
enacted in 2005) does not specify that a court order must be obtained prior to force-feeding an
inmate (*see* PSOAF Ex. 15 at 4), Owens' hunger strikes took place in mid-2004, when Illinois
state courts had only just established that force-feeding inmates does not violate the Constitution.
*Owens*, 635 F.3d at 952–53; *see People ex rel. Ill. Dep't of Corr. v. Millard*, 335 Ill. App. 3d 1066,
782 N.E.2d 966 (2003); *People ex rel. Dep't of Corr. v. Fort*, 352 Ill. App. 3d 309, 815 N.E.2d 1246
(2004).

without saying that suicide is a serious harm.") (citation and internal quotation marks omitted); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 665 (7th Cir. 2012) ("[P]rison officials have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies."), *abrogated on other grounds*, *Kingsley v. Hendrickson*, 576 U.S. 389 (2015).

The exception recognized here is a narrow one. It applies only in situations where "a hunger strike has progressed to the point where continuation risks serious injury or death." *Owens*, 635 F.3d at 955. Mere "weight loss and temporary discomfort" are insufficient, *id.*; the plaintiff must at a minimum have experienced "real suffering, extreme discomfort, or . . . lasting detrimental health consequences" from the defendant's inaction, *Freeman*, 441 F.3d at 547. The degree of objective medical risk is less significant where the prisoner drops from being overweight to a "normal weight for a person of [their] height," but this is not a "complete defense" if the prisoner's weight loss is sufficiently drastic to "seriously impair[]" their health, such as the loss of 100 pounds in just a few months by an overweight individual. *Id.* at 546–47.

## II.    Claims Against Individual Defendants

With these principles in mind, the court turns to the merits of Plaintiff's claims against Dr. Obaisi and Nurses Dimailig and Angeloff. Plaintiff presents two theories for how their medical care during his hunger strike violated the Eighth Amendment. First, he claims that the manner in which Defendants administered his tube-feedings and other treatment was medically inappropriate and caused him serious injury. Second, he argues that Defendants unacceptably risked his life and health by intentionally suspending his tube-feedings at several points over the course of the strike. As explained below, the first of these arguments fails, but there are disputes of fact that preclude summary judgment on Plaintiff's claim that he was deprived of nutrition for dangerous lengths of time.

### A.    Manner of Treatment

Plaintiff first takes issue with the manner in which Defendants treated his medical needs during his hunger strike. He alleges that the nurses both failed to regularly change the NG tubes

used to feed him, and reused old NG tubes rather than switching them out for new ones.  He also claims that the NG tubes were often roughly and improperly inserted, causing symptoms like "bleeding, vomiting, and soreness of the throat."  (PSOAF ¶ 15; *see* Wilson Dep. 56:17–20.) Finally, he claims that Defendants denied him adequate care for his enlarged prostate and failed to follow up on an external hospital's recommendation that he see a urologist.

With respect to Plaintiff's concerns about the feeding tube, Defendants' expert, Dr. John Kress, opined that the conduct of the nurses and doctor in administering the tube-feedings was "reasonable, compassionate, and well within the community standard of care."  (DSOF Ex. 4 at 3.)  Plaintiff does not dispute that Kress—a quadruple board-certified University of Chicago physician with prior experience using feeding tubes on patients—would presumably pass Federal Rule of Evidence 702's requirements for the admissibility of expert testimony.  (DSOF ¶ 48; *see* DSOF Ex. 4 at 6–38 (listing credentials).)  This satisfies Defendants' initial burden of showing that their care was not deliberately indifferent, shifting the burden to Plaintiff to prove the existence of a material dispute of fact on the issue.  Plaintiff has not done so here: he has not offered the opinion of an expert to rebut Dr. Kress, and his own lay conclusions as to the propriety of his treatment are inadmissible.  *See* FED. R. EVID. 701, 702; FED. R. CIV. P. 56(c)(2); *Williams v. Prison Health Sys.*, No. 3:05-CV-154RM, 2007 WL 2915627, at *3 (N.D. Ind. Oct. 2, 2007) (finding the opinion of defendants' expert that plaintiff should not have surgery "undisputed" where plaintiff claimed otherwise based on his and his wife's amateur research, as well as inadmissible hearsay statements from other doctors).  Without any admissible evidence to rebut Kress's medical conclusions, the court is ill-equipped to second-guess them itself.

Consider, for instance, the evidence regarding Defendants' alleged reuse of NG tubes to feed Plaintiff.  Plaintiff testified that he confirmed this was taking place by marking the tubes with a magic marker and checking to see whether the ones he had previously marked were being reinserted through his nose.  (Wilson Dep. 65:14–67:7.)  He alleges that this practice violated instructions that the tubes are for "single use only."  (PSOAF ¶ 9.)  The NG tube package

instructions state that the product is "intended for single *patient* use" and contain an all-caps warning stating "DO NOT REUSE"; it is not clear whether this latter warning refers to reusing the tube between multiple patients or multiple times on the same patient (PSOAF Ex. 11 at 1 (emphasis added).)  Drawing all inferences in Plaintiff's favor, though, there is at least a factual dispute as to whether Defendants violated these instructions.

But Plaintiff has not proven this to be a *material* dispute by showing that the practice of reusing tubes was so clearly dangerous as to constitute potential deliberate indifference.  Kress opined in his report and deposition that the potential health consequences from reusing an NG tube were minimal since the nose and throat are themselves not a sterile part of the body.  (DSOF Ex. 4 at 4; PSOAF Ex. 3 ("Kress Dep.") at 64:22–72:5.)  While he acknowledged that reusing NG tubes on the same patient was not part of "regularly accepted practice" (*id.* at 80:20–81:3) and that doing so theoretically risked infection, he noted that "there is no evidence that [Plaintiff] ever developed any infection related to an 'unclean' feeding tube" (DSOF Ex. 4 at 4.).  Thus, Plaintiff has at most raised a question of whether Defendants' alleged reuse of tubes was negligent—not whether it was unconstitutionally reckless.  Plaintiff "is not entitled to demand specific medical care," or even "the best care possible," but only to "reasonable measures to meet a substantial risk of serious harm to [him]." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

The same logic applies to Plaintiff's arguments that the feeding tube was not changed with sufficient regularity.  It is undisputed that Plaintiff's tube was initially left in for up to a month at a time, then changed out weekly, and finally daily towards the end of his hunger strike.  (Def.'s Resp. to PSOAF ¶ 11.)  Cindy Garcia, a Wexford nurse previously named as a defendant in this lawsuit, testified that NG tubes should typically be changed "at least once every week" when used for daily feeding.  (PSOAF Ex. 7 ("Garcia Dep.") 68:14–24.)  But she also stated that "insert[ing] [and] tak[ing] out" an NG tube "continuously . . . can do more damage" than leaving a properly-positioned tube in place, and that the question of how often it should be changed is ultimately a matter of physician discretion.  (*Id.* at 69:14–24.)  Setting aside whether Garcia's testimony would

be admissible under Rule 702, Plaintiff points to nothing in the record suggesting that leaving an NG tube in for a month constitutes an objectively serious medical risk, let alone that Defendants were subjectively aware of any such risk. "Mere . . . disagreement with a doctor's medical judgment is not deliberate indifference." *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007).

Based on the record, Plaintiff appears to have drawn his own conclusions on the quality of Defendants' treatment while his hunger strike was still in progress. Medical records show that he increasingly refused to allow the nurses to insert his NG tubes and instead did so himself, and demanded that they be changed on a daily basis by pulling them out and throwing them away. (*See, e.g.*, DSOF Ex. 5 at 79, 87.) He repeatedly commented that he did not trust Dr. Obaisi or Stateville's nursing staff to examine him or administer his feedings. (*See, e.g.*, *id.* at 89, 107, 110.) It is certainly possible that Plaintiff—after engaging in hunger strikes for many years—became practiced at inserting the tube himself, and that he found the nurses' attempts to do so clumsy and uncomfortable. (*E.g.*, *id.* at 103.) But the record also suggests that at least some of Plaintiff's discomfort, such as his complaint of a chronically scratchy nose and throat, may have arisen from his demands that the NG tube be "continually" inserted and removed—and, of course, indirectly from his refusal to eat in the first place. (Garcia Dep. at 69:14–18; DSOF Ex. 14.) In this sense, Plaintiff appears to have been the "author of his deprivation rather than a victim of punishment." *Freeman*, 441 F.3d at 545; *see Rodriguez*, 403 F.3d at 952–53 ("[D]eliberate noncompliance with a valid rule does not convert the consequences that flow automatically from that noncompliance into punishment."). And he presents no evidence suggesting that the discomfort he experienced during force-feeding—an inherently risky and invasive procedure—rose to the level of an objectively serious medical risk to his health.[11] Thus, he has failed to raise

---

[11] It is also worth noting that Plaintiff has not clearly established a causal link between Defendants' allegedly improper procedures and his past and present medical issues. Kress opined in his report that "there is no biological connection" between insertion or positioning of the NG tube and any of the symptoms that Plaintiff claims, such as chronic gastrointestinal problems, urinary tract infections, back pain, and "black outs." (DSOF Ex. 4 at 4–5.) He testified that it

a genuine dispute as to whether Defendants were deliberately indifferent in the manner of his tube-feedings.

That leaves only Plaintiff's claims regarding Defendants' alleged failure to treat his back pain and enlarged prostate. The court will address these only briefly, as they are barred by a prior order in this case. Plaintiff claims that he began complaining of back pain in May 2015, but Defendants failed to address his complaints for over six months until he was hospitalized in January 2016 and diagnosed with benign prostate hypertrophy. (PSOAF ¶¶ 21–26.) At the pleading stage, the IDOC Defendants moved to sever all of Plaintiff's claims related to his enlarged prostate under Federal Rule of Civil Procedure 20(a)(1), arguing that the prostate claims differed from his feeding-tube claims both factually and legally. (Defs.' Mot. to Dismiss Pl.'s Second Am. Compl. [105] at 10.) The court denied this motion but held that Plaintiff's "prostate claim . . . is relevant only to Plaintiff's retaliation allegations." (Minute Entry [105].) As already stated, Plaintiff has waived his First Amendment retaliation count by failing to defend it in his response to Defendants' motion for summary judgment. *See Bonte*, 624 F.3d at 466. Accordingly, evidence concerning Plaintiff's back pain and prostate issues cannot be used as a basis to deny Defendants' motion.[12]

---

would be virtually impossible for the NG tube—a soft, plastic device—to cause ulceration or scarring, and that Plaintiff's conditions of erosive esophagitis and gastroesophageal reflux (as diagnosed in a 2019 hospital visit) were completely unrelated to the tube's placement. (Kress Dep. 96:2–105:17, 108:4–110:15; *see* PSOAF Ex. 10 at 2.) As Defendants point out, Plaintiff went on multiple extended hunger strikes before the one at issue here, including one that had lasted for over 600 days as of January 2012. (PSOAF Ex. 9 at 1.) It seems possible, if not likely, that he would face at least some chronic GI problems as a result of subsisting on a liquid diet for multiple years. While Plaintiff is not strictly required to prove proximate causation via expert testimony, *Gayton v. McCoy*, 593 F.3d 610, 624–25 (7th Cir. 2010), or to prove the extent of his damages as an element of deliberate indifference liability, *Cotts v. Osafo*, 692 F.3d 564, 569 (7th Cir. 2012), the degree of lasting harm he suffered from Defendants' administration of the feeding tube is questionable at best.

[12]    Even if this were not the case, the evidence concerning Plaintiff's back pain and prostate issues could not reasonably be used as the basis for a deliberate indifference claim based on an "unjustifiable delay" in medical treatment. *Arce*, 75 F.4th at 679. Plaintiff claims that when he complained to Obaisi about his back pain, the doctor prescribed Tylenol and told him

### B.      Suspension of Tube-Feedings

Next, Plaintiff argues that Defendants were deliberately indifferent to his medical needs by intentionally suspending his tube-feedings for extended periods of time during his hunger strike. He identifies three periods in the record—in August 2014, March to May 2015, and August 2016—when Defendants allegedly refused to force-feed him for multiple days or even weeks. Plaintiff further argues that this evidence is sufficient to grant summary judgment in his favor against Dr. Obaisi, on the grounds there is no dispute of material fact that Obaisi deprived him of nutrition during these periods and that, as a matter of law, doing so constituted deliberate indifference to a serious medical risk.

Defendants urge that this theory is self-contradictory. Citing the language in *Rodriguez* that warns against allowing plaintiffs to "engineer" Eighth Amendment claims, Defendants argue that a claim for being "deprived of involuntary feedings" is inherently nonsensical and puts prison health care providers in an unacceptable double-bind. The court acknowledges this point. If carried too far, Plaintiff's theory of liability presents prison doctors with the unattractive choice of either depriving prisoners of bodily autonomy by feeding them against their will, or opening themselves up to claims of inadequate care by complying with their (professed) desire not to be fed.[13]  *Cf. Freeman*, 441 F.3d at 547 ("No doubt [plaintiff] would have sued the defendants for

---

that his symptoms were due to his bedridden status from the hunger strike. (Wilson Dep. 74:17–78:1.)  This conclusion was certainly rational, and Plaintiff provides no evidence suggesting that Obaisi subjectively knew his "common ailment" of back pain was in fact caused by another underlying condition (his enlarged prostate).  *See Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014).  And while Plaintiff argues that Obaisi denied him care by failing to refer him to a specialist for follow-up care after his diagnosis, the external hospital records he cites (DSOF Ex. 5 at 135–38) do not establish that it was medically necessary for him to see a urologist after Obaisi prescribed Flomax to treat his condition.  *Cf. Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021) (rejecting deliberate indifference claim where Obaisi prescribed Flomax to treat prisoner's enlarged prostate).

[13]      Defendants cite passages from the record in which Plaintiff allegedly made comments suggesting his true motivation was to entrap the Stateville medical staff in civil liability. (*See, e.g.*, DSOF ¶ 24, citing DSOF Ex. 5 at 89 (medical note from January 2016 recording comment by Plaintiff: "I am shopping for a third lawyer to represent me for this [NG tube] thing.

battery had they ordered him force-fed.")  By all appearances, Plaintiff appears to have voluntarily elected to be tube-fed for multiple years at a time during his incarceration, even inserting the tube himself at various points rather than having the nurses do so.  Though he elected not to eat, he also complained about not being fed, and demanded that Dr. Obaisi explain "how was they going to feed him?"   In this sense, he was not truly being "*force*-fed" so much as demanding one form of nutrition over another—and making trouble for the staff who attempted to tend to his medical needs.

That said, the specific facts presented in this case appear to implicate the narrow gap recognized by *Rodriguez*, *Freeman*, and *Owens* involving extreme risks to inmate safety.  As the *Freeman* court noted, while "[f]ree people who are sane have a liberty interest in refusing life-saving medical treatment," prisoners cannot meaningfully claim this interest since "incarceration can place a person under unusual psychological strain and the jail or prison under a commensurate duty to prevent the prisoner from giving way to the strain."   441 F.3d at 547.  Regardless of Plaintiff's motives for entering into the hunger strike and his state of mind in doing so, the fundamental question is whether he was placed in clear and unacceptable danger through Defendants' failure to intervene.

### 1.    Dr. Obaisi

The court finds that sufficient evidence exists to create a genuine dispute of material fact over whether Dr. Obaisi intentionally suspended Plaintiff's tube-feedings for dangerous amounts of time during at least some points over the course of his hunger strike.[14]  In particular, the record

---

But, I know they are going to settle.  Otherwise, they are going to have to give me millions of dollars.  They are so stupid.").  But this comment is both disputed (*see* Pl.'s Resp to DSOF ¶ 24) and, in any event, not clearly relevant to the merits of Plaintiff's claim.  At most, it might suggest that he was in a rational enough state of mind to end his hunger strike before placing himself in true danger—but the court cannot draw such an inference against him at summary judgment.

[14]     This is not foreclosed by the court's initial conclusion that Plaintiff's Eighth Amendment claim would fail as a matter of law under *Rodriguez*, nor by the Seventh Circuit's endorsement of that conclusion.  *See Wilson*, 751 Fed. App'x at 958.  The court drew that

raises a serious question over whether Plaintiff allegedly went without nutrition for more than 53 days from March through May of 2015 at Dr. Obaisi's orders, culminating in an encounter in which Obaisi allegedly told him that it was his "choice to eat or die." (PSOAF Ex. 5 at 3.) Defendants object that Plaintiff bases these allegations in large part on statements made in his own prior grievances and sworn deposition. (*See* Defs.' Resp. to PSOAF ¶ 17.) But this does not preclude consideration of those statements; a plaintiff's own prior affidavit or declaration is a valid evidentiary basis to deny summary judgment "as long as it otherwise contains information that would be admissible if he were testifying directly,"[15] and "[t]here is nothing suspect about the fact that such affidavits are normally 'self-serving.'" *Rooni v. Biser*, 742 F.3d 737, 740 (7th Cir. 2014) (citations omitted). Since Plaintiff can testify from personal knowledge as to what he describes in his grievances at trial, the court may rely on them in assessing Defendants' summary judgment motion. *Wheatley*, 826 F.3d at 420.

Further, even if Plaintiff's reliance on statements in his own grievances is suspect, those statements are corroborated here by other objective evidence in his medical records—in particular, weight charts showing a decline in his weight around the time of the alleged 2015 pause

---

conclusion from Plaintiff's original pleadings, which stated that he "repeatedly refused medical intervention . . . because he did not approve of the manner in which the [NG] tube was being administered." (Order [13] at 2–3 (citing *Rodriguez*, 403 F.3d at 953).) The court stands by its conclusion that Plaintiff cannot prevail under this theory, *see supra* Section II.A., but his amended pleadings and subsequent discovery have helped create a genuine dispute of material fact over whether he was unconstitutionally deprived of adequate nutrition during his hunger strike.

[15]     This is not to say that the full contents of Plaintiff's grievances will necessarily be admissible at trial: they contain embedded statements that must fall within exceptions to the general rule against hearsay to be considered. If Plaintiff testifies consistently with his grievance, about Dr. Obaisi's purported statements, those statements would likely be admissible as opposing-party admissions under Federal Rule of Evidence 801(d)(2)(A), but statements by third-party nursing staff would not be subject to this Rule and would need to be analyzed for another exception. *See Wells v. Obaisi*, No. 16 C 8405, 2020 WL 1491182, at *4 (N.D. Ill. Mar. 27, 2020) (assuming admissibility of hearsay statements by Obaisi for purposes of summary judgment, but refusing to consider statements of a non-defendant nurse). Regardless, both Obaisi's statements and other supporting evidence in the record provide a sufficient basis to deny summary judgment here.

in feedings, from 153 pounds in March 2015 down to 118 pounds in late May 2015. (DSOF Ex. 6 at 11.) The Seventh Circuit recognized in *Freeman* that even a previously overweight prisoner might suffer actionable health issues from a sudden and precipitous drop in weight due to underfeeding. *Freeman*, 441 F.3d at 546. Here, unlike the prisoners in *Rodriguez*, *Freeman*, and *Owens*, Plaintiff was *not* overweight beforehand and had dropped substantially below the "healthy" weight range for a person of his height by May 2015. At 118 pounds, he would be considered underweight for a man of his height (about 5'10"). *See* Nat'l Heart, Lung, & Blood Inst., *supra*. Assuming his "resting" weight was around 170 pounds, this would represent almost a one-third loss of his total body mass from that starting point.[16]

It is not clear whether Plaintiff experienced any "lasting detrimental health consequences" from his episodes of weight loss: he alleges that he experienced blackouts, pain, weakness, and emotional suffering, but these appear to be temporary rather than chronic symptoms. *Id.* at 547. But there is at least some evidence that Plaintiff suffered "medical complications" beyond mere "temporary discomfort":[17] he asserted that he injured his head and back from losing consciousness in August 2014 (though this is disputed), and he was placed on an IV for two days in late May 2015. *Owens*, 635 F.3d at 955. Dr. Obaisi's follow-up request for Boost in June 2015 characterized his weight loss as "severe." (PSOAF Ex. 6.) These facts, taken in the light most

---

[16]     Defendants dispute that Plaintiff had any such typical "resting" weight and note that his weight appears to have fluctuated significantly in the preceding months and years during his prior hunger strikes, down to 123 pounds in December 2011. (*See* Def.'s Resp. to PSOAF ¶ 20, Exs. 3–5.) There is at least some indirect support that Plaintiff's setpoint was closer to 160-170 pounds, though, in that he gradually returned to this weight by September 2015 after his force-feedings resumed. (DSOF Ex. 6 at 21.)

[17]     Precisely what burden a plaintiff must satisfy to make out an Eighth Amendment claim for refusal to feed in response to a self-inflicted hunger strike is not made fully clear between *Freeman* and *Owens*. The latter suggests that a plaintiff must prove actual "medical complications" beyond "weight loss and temporary discomfort," *Owens*, 635 F.3d at 955, but the former suggests in passing that "real suffering [or] extreme discomfort" in combination with a clear risk of injury might also suffice, *Freeman*, 441 F.3d at 547.

favorable to Plaintiff, present a sufficiently greater risk of serious injury than was present in either *Rodriguez*, *Freeman*, or *Owens* to warrant a jury's review.

Plaintiff has not produced an expert opinion on this risk of injury, but there is no real dispute about his claim that starvation constitutes an objectively serious medical condition. *See Greeno*, 414 F.3d at 653 (such conditions include those "so obvious that even a lay person would perceive the need" for medical intervention); *Freeman*, 441 F.3d at 546; *Owens*, 635 F.3d at 955. And there is no question that Dr. Obaisi would have been subjectively aware of such a risk—as evidenced by his alleged comment in May 2015 that Plaintiff "w[ould] just die" if he did not end his hunger strike. (PSOAF Ex. 5 at 4.) Even Dr. Kress acknowledged in his deposition that "[t]o intentionally withhold feeding" from a "person who is relying on NG tube feedings" would be "below the standard of care," though he quickly clarified that "I don't think that's what happened here." (Kress Dep. 78:18–79:13.) And while he opined in his report that "an extended period of no caloric intake never took place while [Plaintiff] was in Stateville from 2014 to 2017" (DSOF Ex. 4. at 4), he later conceded under examination that he had not accounted for all of Plaintiff's medical records in reaching this conclusion (Kress Dep. 111:24–117:4).[18]

Defendants argue that, even assuming Dr. Obaisi did order a temporary pause in Plaintiff's tube-feedings, nothing in IDOC's policy on hunger strikes prevented him from doing so and "it is clear that he did so because it was in the best interest of Mr. Wilson." (Defs.' Reply in Supp. of Mot. for Summ. J. [258] at 6.) They note that Plaintiff continued to be regularly monitored by prison medical staff and that "when Dr. Obaisi felt it was medically indicated to re-start the involuntary feeding, he did just that." (*Id.*) Defendants are correct that there was nothing in IDOC's Administrative Directive requiring Obaisi to maintain daily force-feedings, or indeed any

---

[18]     Kress's conclusion in the report that Plaintiff was "never emaciated" during his hunger strike appears to have been significantly influenced by the September 2017 medical progress note from Cook County Jail stating that Plaintiff had a BMI of 24 and was "almost overweight." (*See* DSOF Ex. 4 at 3–4.) However, this note dates from after Plaintiff declared his intention to end his hunger strike in February 2017. (DSOF ¶ 10.)

frequency of force-feedings at all. The policy only establishes a procedure for determining when it is appropriate to *begin* force-feeding a patient; it contains no instructions for how long force-feedings should be conducted once this decision is made, leaving this in the prison doctor's implied total discretion. (PSOAF Ex. 15 at 5.) But this is a different question from what is required under the Eighth Amendment. Even if a prison doctor has substantial latitude to determine how and when a patient receives involuntary nutrition, they cannot do so in a way that is unconstitutionally reckless and endangers life.[19]

Perhaps Dr. Obaisi sought to use Wexford's denial of his Boost order as an excuse to coax Plaintiff off his hunger strike, by temporarily pausing his tube-feedings and trying to wear down his resolve. If so, the court expresses no opinion on whether such a pause would be medically appropriate for some limited period of time, though it notes in any event that Defendants' expert reached no such conclusion (Kress Dep. 78:18–79:13). *See Reed*, 178 F.3d at 853 (whether food deprivation constitutes an objectively serious risk depends on "the amount and duration of the deprivation"). But it strains credulity to argue that refusing to force-feed a hunger-striking patient for *53 days*—as Plaintiff claims to have occurred in May 2015—was medically safe or advisable.

Whether Plaintiff will be able to prove significant damages from this conduct is uncertain. As noted, it is not at all clear that he suffered any lasting health consequences from being deprived of nutrition; while he describes experiencing severe and chronic GI issues today, it seems

---

[19] As further justification for Dr. Obaisi's actions, Defendants cite the opinion of Dr. Ari Rubenfeld, the ENT who Plaintiff saw in October 2015 for a chronically sore throat. (Defs.' Resp. to PSOAF ¶¶ 18–19.) Dr. Rubenfeld opined that Plaintiff's symptoms were an "expected result of [his] chronic NG [tube]" placement, and recommended "no intervention unless [Plaintiff] eats or consents to [a gastrointestinal] tube." (DSOF Ex. 14.) This argument fails. Dr. Rubenfeld's recommendation of "no intervention" was clearly limited to potential treatment for the symptom he had been asked to evaluate, i.e. Plaintiff's nose and throat issues. As an ENT, he would have had no special insight or authority to opine on whether pausing Plaintiff's force-feedings was medically advisable. Nor did Dr. Rubenfeld suggest that the collateral health consequences from NG tube placement justify allowing a patient to starve himself.

possible (if not likely) that that these complications arose in key part from his own decision to forgo solid food for multiple years while incarcerated.  (PSOAF ¶¶ 32–33.)  Without an expert of his own, Plaintiff may have difficulty tracing any of his long-term symptoms back to the specific episodes of food deprivation at issue.  But those are issues for trial, not summary judgment.  *See James v. Perez*, No. 16 C 8986, 2018 WL 4005196, at \*5 (N.D. Ill. Aug. 22, 2018) (noting that "although [plaintiff] may have a viable constitutional claim, what damages he can receive . . . is questionable," but still denying summary judgment since "[d]amages are not an element of liability in a deliberate indifference claim") (citing *Cotts v. Osafo*, 692 F.3d 564, 569 (7th Cir. 2012)); *Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010) (noting that "[p]roximate cause is a question to be decided by a jury" and need not necessarily be proven through expert testimony).

### 2.    Nurses Dimailig and Angeloff

The court's conclusion as to Dr. Obaisi does not automatically mean that Nurses Dimailig and Angeloff were deliberately indifferent in carrying out his orders.  "As a general matter, a nurse can, and indeed must, defer to a treating physician's instructions."  *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 485 (7th Cir. 2022).  Such deference cannot be "blind or unthinking": in situations where a doctor's orders pose a clear risk of harm to a patient, nurses have an ethical duty to "take appropriate action . . . by discussing the[ir] . . . concerns with the treating physician or by contacting a responsible administrator or higher authority."  *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (citation omitted).  Their failure to do so does not per se violate the Eighth Amendment, but it can be relevant to determining whether they were deliberately indifferent to a prisoner's serious medical issue.  *Id.*  "Nurses, like physicians, may thus be held liable for deliberate indifference where they knowingly disregard a risk to an inmate's health."  *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2005) (citation omitted).

In *Rice ex rel. Rice v. Correctional Medical Services*, the Seventh Circuit applied these principles to reject a claim against several nurses for failing to adequately care for a schizophrenic detainee who died from excessive water drinking, but was also found upon autopsy to be

26

underweight and malnourished from refusing to eat while in jail. 675 F.3d at 660–64. Prior to his death, the nursing staff had "visited [him] multiple times daily, monitored his weight, [and] regularly made efforts to get him to eat more" by providing him with extra snacks and nutrition shakes, but did not take steps to involuntarily feed him. *Id.* at 661, 682. The court found that, while under *Freeman* "[the detainee's] malnutrition would be actionable regardless of whether it contributed to his death," the defendant nurses were at most negligent—not deliberately indifferent—in their attempts to manage his nutrition "without resorting to extraordinary measures like forced feeding." *Id.* at 683.

The court sees no basis for liability against Dimailig and Angeloff in this case. Notably, Plaintiff's complaint and summary judgment briefing never ties these two individuals specifically— as opposed to Stateville's "nurses" in general—to the disputed conduct at issue. During his deposition, Plaintiff identified them only as "medical personnel who had contact with [him]" and "defendants in [his] complaint," but offered no specific details regarding their involvement and did not recall why he had sued Angeloff at all. (Wilson Dep. 30:12–20, 32:11–12, 33:5–9.) "Individual liability pursuant to § 1983 requires personal involvement in the alleged constitutional deprivation," and Plaintiff "has not been able to demonstrate that these [two] defendants were personally involved in the denial of medical care." *Est. of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017) (citations and internal quotation marks omitted); *cf. Harris v. Wexford Health Sources, Inc.*, No. 15 C 10936, 2022 WL 991949, at *1–5 (N.D. Ill. Mar. 31, 2022) (deliberate indifference claim against single nurse under Obaisi's supervision that described nurse's personal involvement in detail).

The only evidence Plaintiff cites that even remotely implicates Dimailig and Angeloff is the series of "medical services refusal" forms signed by multiple Stateville nurses dating to August 2014 and spring 2015. While Plaintiff does not explicitly point out as much, Dimailig's and Angeloff's signatures do appear on these forms at certain points during the periods in question. (*See, e.g.*, DSOF Ex. 8 at 125, 131, 143, 155 (signatures from August 10 through 24, 2014);

DSOF Ex. 9 at 67, 112, 125, 147, 173, 193 (signatures from March 26 through May 15, 2015).) But this at most suggests that these two nurses visited Plaintiff while he was allegedly being deprived of liquid nutrition and attempted—often unsuccessfully—to assess his vital signs and weight, as well as to cajole him to eat solid food. There is nothing in the record establishing that Dimailig and Angeloff subjectively knew Plaintiff was continually being denied force-feedings on days when they did not visit him. And even if this inference could be drawn from their signatures alone, their actions in following Dr. Obaisi's orders would at most be negligent under *Rice*, which suggests that nurses have no independent Eighth Amendment duty to take the drastic step of force-feeding an inmate without physician input.[20] 675 F.3d at 683.

Accordingly, the court denies Defendant's motion for summary judgment (as well as Plaintiff's cross-motion[21]) as to Plaintiff's claims against Dr. Obaisi, but grants the motion as to Nurses Dimailig and Angeloff.

## III. *Monell* Claim against Wexford

Finally, the court turns to Plaintiff's Eighth Amendment claim against Wexford. Under controlling Seventh Circuit precedent, Wexford—a private corporation that has contracted with the state to provide essential government services—is equivalent to a municipality for purposes

---

[20] During the August 2014 episode, Plaintiff alleged in his grievance that it was the nurses themselves who collectively refused to force-feed him out of purported concerns for their safety. (PSOAF Ex. 4 at 1.) But this grievance never identifies any particular nurse—much less Dimailig or Angeloff—by name. And if Dimailig or Angeloff were involved, Plaintiff's grievance suggests that he had "refuse[d] to cooperate with the hunger strike feeding procedures" and that his conduct required the presence of the prison's tactical team—meaning that Plaintiff was the "author of his deprivation." *Freeman*, 441 F.3d at 545.

[21] Plaintiff's cross-motion merits little discussion. If the evidence is too disputed to justify granting summary judgment for Defendants, the opposite is clearly true as well: there are far too many unresolved questions of fact over how, when, and to what extent Plaintiff was dangerously deprived of nutrition to warrant a dispositive ruling in his favor. (*See* DSOF Ex. 4 at 4 (conclusion by Dr. Kress that Plaintiff was "never emaciated" and that "an extended period of no caloric intake never took place while he was in Stateville from 2014 to 2017); *id.* at 2 (note by Dr. Kress that the record contains "several notes indicating that [Plaintiff] would take food off the trays of other inmates").)

of § 1983 liability. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021) (citing *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 786 (7th Cir. 2014)). Wexford thus cannot be held vicariously liable for actions of its employees; Plaintiff must show that "his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy."[22] *Shields*, 746 F.3d at 796; *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The policy or practice "must be the direct cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (citation and internal quotation marks omitted).

Plaintiff has not met this burden. First, it is undisputed that Wexford employees at IDOC locations such as Stateville follow the IDOC's policies and procedures on hunger strikes. (*See* Pl.'s Resp. to DSOF ¶ 39.) As the court has already noted, the IDOC's Administrative Directive on hunger strikes only sets up a process for deciding when to start force-feeding prisoners, not how to do so once this decision has been made. (PSOAF Ex. 15 at 5.) Plaintiff does not challenge the constitutionality of this policy itself (which, again, is the state's, not Wexford's), nor does he argue that Wexford "consciously chose" not to implement it in a way that might suggest an Eighth Amendment violation.[23] *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 380 (7th Cir. 2017).

---

[22]     While this court applies the law as it exists today, it shares the skepticism that several panels of the Seventh Circuit have expressed on the wisdom of extending *Monell*'s holding to private corporations. *See Shields*, 746 F.3d at 793–95 (noting that neither the text, legislative history, or interpreting caselaw of § 1983 mandate such a result); *Howell*, 987 F.3d at 653–64.

[23]     Indeed, Plaintiff has at multiple points faulted the individual Defendants for failing to comply with the Administrative Directive's (nonexistent) instructions for force-feeding prisoners, though he backed off this position in his summary judgment papers. (*See, e.g.*, PSOAF Ex. 5 at 3 (allegation in May 2015 grievance that Obaisi's actions "clearly violate[] . . . the Administrative Directive"); Third Am. Compl. ¶ 12 (allegation that "[p]ursuant to IDOC Policy, when a person is involuntarily force fed, the tactical team is supposed to be present at all times and the feeding is to be recorded"); Wilson Dep. 36:13–23 (when asked in his deposition "are you claiming the medical staff didn't follow Wexford policy or the policies are wrong," Plaintiff responded, "Policy was not followed.").) Even if the Administrative Directive did contain the requirements that Plaintiff describes, violation of an otherwise valid state policy is neither necessary nor sufficient to prove a constitutional violation. *See Glisson*, 849 F.3d at 380 ("Nothing in the U.S. Constitution required

Instead, Plaintiff attempts to argue that Wexford maintained an informal "practice or custom" of violating his rights—but he has failed to meet the high burden required for this theory. Doing so requires showing a pattern of "systemic and gross deficiencies" that is so "pervasive" as to amount to a de facto policy, rather than a series of isolated incidents. *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020). In general, "the frequency of conduct necessary to impose *Monell* liability must be more than three." *Id.* at 427. Here, Plaintiff provides no evidence that any other inmates experienced equivalent conduct while on hunger strikes. *Howell*, 987 F.3d at 655. He only alleges that he himself was deprived of nutrition for three extended periods during his hunger strike. These "three instances involving Dr. Obaisi that [Plaintiff] alone experienced . . . do not provide enough evidence that there is a true Wexford policy of denying or delaying care to survive summary judgment." *Frison v. Wexford Med. Servs.*, No. 17 C 212, 2021 WL 4477825, at *5 (N.D. Ill. Sept. 30, 2021) (citation and internal quotation marks omitted). Indeed, given the striking facts of Plaintiff's case—involving a hunger strike lasting over *three years*—it is hard to imagine how Wexford could possibly have maintained a regular pattern of unconstitutional conduct in responding to cases like his. *See Miranda v. Cnty. of Lake*, 900 F.3d 335, 344 (7th Cir. 2018) (rejecting *Monell* claim where jail had a "system in place" to handle hunger strikes and deceased pretrial detainee "went longer without food and water than anyone else in the Jail's experience," though reversing lower court's judgment as a matter of law for individual medical defendants).

As an alternative path to *Monell* liability, Plaintiff could show that his injury was caused by the act of an official with "final policymaking authority." *Howell*, 987 F.3d at 653. The only evidence in the record of a relevant decision by a senior Wexford official here would be the March 2015 denial of Dr. Obaisi's nutritional supplement order by Paul Saporito of Wexford's corporate office, which supposedly spurred Dr. Obaisi's decision to cut off Plaintiff's force-feedings. (DSOF

---

Corizon to follow INDOC's policies."); *Lawrence v. Dart*, No. 21 CV 1375, 2022 WL 220303, at *8 (N.D. Ill. Jan. 25, 2022) ("Generally, if the municipality has a lawful policy that the employees aren't following, that is not on the municipality (without more).")

Ex. 13 at 1.)  But Plaintiff does not even argue that Saporito constitutes a "final decisionmaker" for purposes of *Monell* liability, and the court will not draw this inference itself without any information in the record on Wexford's process for reviewing nutritional supplement requests, Saporito's role within this process, or his level of authority more generally.  *Cf. Banks v. Dart*, No. 21 C 6611, 2023 WL 6388063, at *14 (N.D. Ill. Sept. 29, 2023) (granting motion to dismiss where plaintiff failed to allege that "any Wexford employee had final policy-making authority").  Wexford is thus entitled to summary judgment on Plaintiff's *Monell* claim.

## CONCLUSION

Defendants' motion for summary judgment [235] is denied as to Plaintiff's Count I against Dr. Obaisi only, but is otherwise granted as to all other counts against all Defendants, as well as to Plaintiff's claim for punitive damages.  Plaintiff's cross-motion for summary judgment against Dr. Obaisi [237] is denied.

ENTER:

Dated:  March 28, 2024

_____
REBECCA R. PALLMEYER
United States District Judge